May it please the court. My name is Leo Terrell. I represent Ms. Alice Robbins. Your honors, this is an issue of law. The ADEA, the Older Workers Benefit Protection Act. Respectfully, the magistrate erred at the early outset of this case in the summary judgment of not recognizing that the OWBA, something that has to be done, the judge should have ruled, at the very least, that Ms. Robbins' requirement to sign this document where other employees were not required. The document itself violated every provision. It violated the obligation. Well, on the summary judgment issue, the magistrate judge, or the judge, there was consent for the magistrate judge to preside and to enter a final judgment. He just determined that there were tribal issues of fact and the case needed to go to trial. Right. So for all intents and purposes, we're really concerned about what happened at trial, not the summary. In fact, our case law says that if summary judgment is denied and the case actually goes to trial, then we look at what happened at the trial because, you know, that's what we have. You're appealing from the jury's verdict. Well, let's focus on the trial. He should have given an instruction to the jury. One of the attorneys before me said that jurors figure out facts, but not on the law. The jurors are not lawyers. And the provisions of the OWBPA was a crucial issue of law that he needed to explain. Let me understand this. The old Workers' Benefit Protection Act, there really is no the remedy that's available for a violation of that is you get to set aside the agreement. Exactly right. Is that right? You're absolutely correct. And you didn't have a cause of action predicated on that act. Is that right? Correct, Your Honor. Absolutely. Your claim was a retaliation claim. Correct, Your Honor. And what were the three elements that you needed to establish? You have to engage in protective activity. The protective activity was her prior EEOC complaint. And nobody disputed that. No one did. All right. What's the next element? Adverse action. Here's the adverse action. The submission of that illegal document where other similarly situated employees did not have to sign it, did not have to sign it, did not have to sign it to get the golden handshake. That's where you could the problems are great. But that's where the adverse action is in play. And the jurors did not know that that agreement that she received. Well, now, one of the things that the magistrate judge, the judge who was presiding, at some point along the way, he decided he was going to at least instruct the jury about the Old Workers' Benefit Protection Act. You're right. He wasn't going to make any determination one way or another whether the settlement agreement was violated. He was going to explain the provisions and the facts of the provision would have been played out. He decided not to do that because, as I understand it from what happened at the trial, was that she ultimately got, what was it, 10 days? She ultimately was able to consult with a lawyer. And about 10 days after they extended the period of time, she said, I'm not going to take it. So he said, it doesn't make any difference. She got, essentially, she effectively got what she was entitled to. Oh, Your Honor, that provision, that agreement she got said that she could only, she waives her right to a lawyer. She only had 24 hours to review the agreement. She could not go back to work at the place. And that she didn't get the most valuable part. This was an exit incentive plan, two or more people. She didn't get the 21 or 45 days. That has to be in writing. Whereas, as you correctly stated, Your Honor, the protective activity, the similar situated employees didn't have to sign that agreement at all. They got the benefits. They got the golden handshake. They didn't have to sign. They got the ability to come back to work. They got the golden handshake. Your Honor, the judge said to me, I can argue that to the jury. This learned court knows that my words as I speak to you today are not facts. You don't, it's a jury instruction. What's the third element of your claim, then, for retaliation? Then, after the adverse action, the resulting effect that it had. The causation. The causation. She lost retirement benefits. She had lost, and we stated it, $5,000 that she could have received in addition. Your Honor, it is. $5,000 is the golden handshake? Well, the golden handshake would have given you extra years of retirement benefits. But she ultimately turned it down, right? I mean, I understand that the document said she had 24 hours, but she didn't take 24 hours. She took 10 days. She talked to a lawyer. And then it wasn't like she signed the thing. She said no. Right. She turned it down. She turned it down. But as I have been saying, as the court, Judge Aya said, where is the adverse action? Why was, and Ms. Teresa St. Peter said it very clear in our supplemental excerpt. She said the reason why we're offering this document, because she tried to sue us. She tried to engage in protective activity. That's the reason why we motivated her. Their motivation was her engagement in protective activity as to why they gave it to her and not the other employees. And the other employees didn't have to go through this. Why? Because Ms. Robin exercised her right to engage in protective activity. But it seems to me, with all due respect, it seems to me that if there is adverse action, it's more on that provision that you just focused on, that she can't return to work, right? But it's not so much the notice or how much time she had to review it, because ultimately she did have enough time to consult with you, right? And then presumably decided, hey, this is not for me anyway. Well, look what happened immediately thereafter. And I think the agreement, and this is where we go back to that instruction where the judge contemplated. The jury needed to be informed of that information because later on, what the respondent did was to introduce to the jury that another employee signed this same onerous agreement, the same onerous agreement, to give the jury the impression that that agreement was okay, that she decided not to. But the jury, I assume, did learn that Ms. Robin's agreement had this extra provision that no one else had. No. No, Your Honor. It was a judge said to me, you can argue this. Well, no, no. I'm not talking about in the jury instruction. I'm just saying as a factual matter, the jury knew that she was offered a less desirable golden handshake agreement than other employees, right? Yes. And the reason it was less desirable in terms of she couldn't return to work, that's not something that's prohibited by the Older Workers Benefit Protection Act, is it? Well, no, but the one thing, no, not at all. But the aspect of setting aside not returning to work is not the issue. She lost the benefits of the golden handshake, the extra retarget money, the extra benefits of the agreement. The golden handshake, as she signed that agreement, she lost her failure to sign that agreement, resulting in her receiving a monetary loss. She didn't fail to accept that agreement because of any violation of the provisions of the Older Workers Benefits Protection Act. That's what I'm stuck on. Well, here's my point, Your Honor, to answer that question directly. If that agreement was fully complied with in addition to showing which employees were allowed to stay and not to stay, she would have been able to make an informed choice. We're speculating right now as to what would have happened had she been given all the information. It's just not 2145 days. It's a situation where she had to have the right to know the employees who were being retained and not being retained. So did you put in evidence at the trial that if she had had this other information, she would have done something different? As far as evidence, did we put in evidence that had she known? In other words, if she had gotten the 21 or the 45 days or whatever, whichever it is, that she would have done something different. Or if the other employees, whoever they were, would have been listed, that she would have done something different. Was there any evidence like that at all? I don't think there was evidence of that because we never got to that point. I mean, what you're talking about is the judge not giving an instruction. The judge didn't preclude you from putting in evidence, did he? Well, Your Honor, the point is that we did put on evidence to show, to answer your question, that other employees who refused to sign this agreement, they were allowed to keep their jobs. They were allowed to keep their jobs. And what happened to Ms. Robbins? The day after she decided not to turn it, to take this agreement, what happened to her? Her job was cut in half. Her job was cut in half. We're talking about the adverse activity. But the jury found against you on that point. I agree with you. That seems like a much more severe adverse action than anything that's connected with this Golden Handshake Agreement. But, you see, I think the issue here is that the jury never felt that Ms. Robbins was treated differently with that agreement. Because, as I have to stress this, the respondent, knowing that the judge was not going to provide this evidence or provide this instruction, then immediately put on testimony from Ms. St. Peter's that another employee, Monica Greeney, signed this same onerous document. The jury is thinking, well, Ms. Robbins just chose by point not to sign it. Ms. Greeney did. And look at what happened with what Ms. Peter said in her deposition. Ms. Peter said in her deposition, and we provided that testimony, she didn't even know what the ADA was. She didn't even know anything about the Older Workers Benefit Protection Act. She didn't know anything about the reasons why that information had to be in the agreement. At trial, she did a 180. She fabricated her story at trial. We compare her deposition. This is the human resource manager. And the human resource manager said at deposition, we gave her this onerous agreement for one reason. She sued us. That's not why you give the Older Workers Benefit Protection Act. You give the Older Workers Benefit Protection Act to protect the employee. And the judge was vacillating back and forth, whether I should give this instruction, whether not. She has to give that instruction, because that would have negated the respondent's ability to introduce Monica Greeney's statement or her agreement, saying, uh-oh, well, we know this agreement violates the Older Workers Benefit Protection Act. We're not suing. The act itself of giving her that agreement was an act of retaliation. The resulting end, after she refused to sign it, her job's cut in half, and she's terminated. No other employee in that arrangement had their job cut. Five employees didn't have to sign the agreement. And the four who refused to sign the agreement kept their job full time. The only one was the person, as Judge Pius asked me, the first element, who engaged in protective activity. So you got to put in evidence of these other employees who got to keep their job, right?  And the respondent put in, Your Honor, the testimony of Monica Greeney. That signed an exact copy that Ms. Robin refused to sign. All we were asking for was the judge to make sure he didn't leave the information of the instruction of that document to the jury. The jury were not lawyers. And all we asked for, he thought about it. And then he said, well, you know, I don't want to bring an expert in to talk about the law. Well, that's the job of the judge, to instruct. That's not quite accurate. But, Mr. Torello, did you want to save some time for rebuttals? Yes. I would like to save the last three minutes. Thank you, Your Honor. May it please the Court, Jung Yim on behalf of Appelli, City of Monrovia. Thank you for this opportunity, Your Honors. The district court's jury verdict for Appelli should be affirmed. And I think there's essentially two points that I would like to address for this court. And I'd like to begin with this one, which is that the district court did not err in, by not instructing the jury on the waiver requirements under the Older Workers Benefit Protection Act. And if it did, and if this court is inclined to find that it did err, we would argue that it was more probably than not harmless. I think the important issue here is we need to really look at what the evidence at trial was. Ms. Robin retained Mr. Leo Torello, an expert in this field, a former advisory board member of the EEOC, on June 5th, 2009. On June 8th, 2009, Ms. Robin approached our HR director, Ms. St. Peter, and said, I am interested in the Golden Handshake. Let me back up for one second. She said back in April of 2009, the Golden Handshake was presented to Ms. Robin, and at that time she was not interested in the offer. What were the terms of the deal that was on the table then? Back in April? Yeah. There was no actual deal on the table. It was essentially a meeting to find out what this two-year service credit would do in terms of retirement enhancement. So that was explained what the benefits are. There was no actual exchange of information. But had the city actually adopted that? In fact, is that what they were going to do? Yes. I mean, ultimately that was the plan. I mean, there was significant fiscal restraint going on at the time. The Golden Handshake was one of the ways the city was looking at just trying to save money. Was that like at a group meeting where Ms. Robin was at the meeting? It was not a group meeting. She had a one-on-one meeting with Ms. St. Peter. And she says no. She says no. According to Ms. St. Peter's testimony trial, according to her, Ms. Robin was not interested in the offer at that time. So we fast forward to June 2009. She retains counsel June 5th. June 8th, she approaches Ms. St. Peter and says, I'm interested. June 9th, I'm sorry, June 10th is actually the deadline that Ms. St. Peter has to submit the names of individuals who will be taking this agreement to city council meeting, which is by June 16th. It's got to be agendized, put into a packet, and provided for the city council. So Ms. St. Peter says, okay, I'll get you an agreement. She gets her an agreement by June 9th and says, you know, I need this by tomorrow. It still happens. Ms. Robin says, this is not enough time. I mean, they have email exchanges with each other. They have, I believe, a meeting as well. Ultimately, Ms. Robin is given until June 30th to consider the agreement. Now, the evidence at trial. Now, was the agreement modified to reflect what's required by the Older Workers Benefit Protection Act? I would indicate that the terms were not in exact compliance with the Older Workers Benefit Protection Act. Yes, that's correct. And it didn't change at that time. So she has until June 30th to consider this agreement. After consulting with her attorney, by June 19th, she has already rejected this agreement. So she didn't even take the whole amount of time, the extra time that was given to her. Exactly. She had 11 additional days to consider the agreement, and however, she rejected the agreement by June 19th. And so at that point, Your Honor, the purpose of the Older Workers Benefit Protection Act is really plain. I mean, it's just set forth in the language. It's to govern the effect of a waiver. And if she did not accept the agreement, there is no waiver to waive. I mean, she didn't waive any ADEA claim. In fact, she was able to file a lawsuit, a Title VII lawsuit, an age discrimination lawsuit based on the ADEA, because she did not waive that provision by signing the agreement. The jury instruction – Well, she wasn't making an older – she didn't have a separate claim for violation of the Older Workers Benefit Protection Act. That's correct. Well, initially, she – Because there's no – the only remedy is you get to undo the settlement, the golden handshake package. That's correct, Your Honor. And so ultimately, I think what the judge was faced with was, do I give an instruction on the waiver requirements under this act when the evidence in trial is that she rejected the agreement? And she rejected the agreement not – I mean, she had 45 days or even 100 days to – Why would you tell counsel – you could just argue it. Argue that it violated the Older Workers Benefit Protection Act. Well, I'm not sure if the judge meant it in that context. I think the issue was the district court judge was essentially saying, you could present your case. I mean, of all the retaliatory adverse actions that were at issue, and I think Your Honor mentioned this, is that she was – her job was reduced half-time. She was laid off. I mean, these are more serious adverse acts. An offer of a benefit is certainly not an adverse act, you know, based on the cases I've read. And so that's what the judge – I think that's what the judge was going to, is present your evidence and see what they say. But I think the other important point is – Did he let the jury decide whether there was an adverse act? Yes. Yes. He didn't argue as a matter of law there was no adverse act, did you? I think we did file a motion to eliminate prior to trial saying that the offer of a golden handshake was not adverse as a matter of law. But after you finished – after Mr. Correll finished the presentation of his evidence, the plaintiff's evidence, did you make a Rule 50A motion? Your Honor, as a matter of law, there's no adverse action here. We – to be honest, Your Honor, there's a lot on my mind. I don't recall if we did. For some reason, I believe we did. I don't think it was narrowed to that particular golden handshake offer because there was four potential adverse acts. I mean, it's sometimes a try to eliminate issues with a Rule 50A. Sure. Sure. The final point, or there's two additional points I would like to make on this jury instruction issue, is that if the court is inclined to find that it was error by not providing this instruction, then it was probably more than not – more probably than not harmless. And the reason being is, again, the evidence at trial. I mean, I've already reiterated this point, but she rejected the agreement on advice of counsel. She had enough days to consider this. She had 11 additional days to consider this, and she didn't use that time. But I think it's also important to know why she rejected this agreement. The evidence at trial on direct examination was she gave three reasons why. She said, initially, I rejected this agreement because I didn't have enough time. Number two was I didn't have advice of counsel. And number three was because there was a provision in the agreement that prohibited me from returning back as an employee at the city. Well, as the evidence unfolded at trial, we know that she did have enough time. She did have advice of counsel. And so those were not issues. The third reason, which is that she was not allowed to return to work, the other employee that was given this almost identical agreement was also prohibited from returning to work. But the issue is that is not one of the waiver requirements under the Act. Well, you know, just listening to you give that argument, though, I assume that you objected to the giving of the instruction that Mr. Terrell requested. Yes, we did. Why? What's the harm? What would have been the harm in giving the instruction, given everything you've just said? Well, I think, initially, the initial – our initial thought was, why instruct a jury and confuse them? Because, essentially, what we're saying, by giving them the instruction, we're presupposing that there was an agreement, because the instruction only applies for waivers. And there was no waiver here. So to instruct the jury to say, these are the requirements of the waiver, and then to say to them, well, there was no waiver, because she never executed the agreement, would only confuse them. And it could actually prejudice them to say, well, look, she actually was only given 21 days or 45 days. Even though she rejected it after 10 days, perhaps it could prejudice them. And so that was our concern. But we don't think it would have been harmless, because, again, based on the evidence. I mean, we would argue it's harmless based on the evidence. So during your closing argument, did you address the Older Workers Benefit Protection Act? We addressed each and every adverse action that was at issue, the first one being, if you saw the actual jury verdict form. The verdict, yes. The jury found only the written reprimand that was issued to her as the only evidence of adverse act. The golden handshake offer, the reduction of her position to a halftime position, the ultimate layoff, were not retaliation, as the jury found, nor adverse acts. And just for the Court's enlightenment, the written reprimand itself, there was evidence introduced at trial that the EEOC had issued a determination letter finding reasonable cause that there was retaliation for issuing the letter of reprimand. If I have one moment, Your Honor. Unless the Court has any additional questions. Thank you very much. I'd like to raise some of the issues that this Court asked questions for. That they never provided the agreement in its correct form, and it's not just the 21 days. It was to list the employees who were also involved. Let me be very clear. No one was required to sign that agreement and receive the golden parachute. And the Monica Greeney situation, which I'll address, was the only employee who was forced to sign that agreement. And they presented that evidence after the judge decided not to give that instruction. Because Judge Pius asked a question, could you argue that in the closing argument? Yeah, they argued in the closing argument. They said there was nothing wrong with the agreement. They said there was nothing wrong with that agreement, that Monica Greeney signed it, but Ms. Robbins elected not to. When you have an exit incentive plan, you're supposed to give the plan to everyone. Well, look what happened. Six employees, and we put them in our brief, did not have to sign that document. Five employees, and they received the golden handshake. Five of them said we don't want to sign it. They kept their job. The only person who was cut in half and then eventually terminated was Alice Robbins. Teresa St. Peter said our motivation for giving her that document was because she engaged in protective activity. And then she did a reverse about face. My colleagues fought the Dickens not to have that argument, not to have that simple instruction. As Your Honor, you asked, why didn't you? Did you fight it? Yeah, they fought it. They fought it because then after the court said I'm not going to do it, then they put on that Monica Greeney signed the same document. And then in their closing argument they said Ms. Robbins didn't sign the agreement. She had the opportunity just like Monica. That was in their closing argument. They used that. Did you argue the Older Workers Benefit Protection Act during your closing argument like the judge said? You can argue it to the jury. Oh, yes, I argued. And I also saw the jury instruction when you pointed out. I argued. And that jury instruction said lawyers' words are just arguments. I had a losing battle to argue that because everything that came out of my mouth, just like I'm arguing here, is not the law, is not the facts. So I had a disadvantage. But the jurors saw that, that Monica Greeney signed that document, and they can assume that there was nothing wrong. What was the harm for the judge to give that instruction? It would have significantly changed the strategy of that case. They would not have been able to introduce Monica Greeney's document. We were at a disadvantage because of magistrate error. My colleague admitted to you that that agreement was not in compliance. And they focused on the 2145 days. No, they didn't list the employees who were offered this plan conveniently because by listing them, we would have seen if they were required to sign that same document, if they were required to fill out that document in order to get the golden parachute. My client was. Ms. Robin gave testimony about what the problems were with this. Was there any testimony? I mean, did you elicit from her at the trial that if those other names had been listed that she would have done something different? We listed. We did a list from Teresa St. Peter's, the name of the other employees. I'm talking about did you elicit from your client that she would have done something different if the agreement had had the material in it you're talking about right now. I did not ask that particular question specifically. Would she have done something differently had she signed the agreement? Because we never knew what the agreement would have been in the true form because the city never offered it. But I didn't answer it. We did not ask that question. Your Honor, in closing, all we're saying here is that the magistrate respectfully erred and that there should have been an instruction to the jury so the jury could have been informed in dealing with the facts appropriately. I thank you for your time. Thank you, Mr. Terrell. Thank you, Mr. Yin. Appreciate the arguments on this case. The matter will be submitted.
judges: Kennelly, Paez, Watford